## JOE SAFFA v. STATE.

No. A-10080. July 22, 1942.

(128 P. 2d 241.)

Chas. E. Webster, of Drumright, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Everett S. Collins, Co. Atty., of Sapulpa, for the State.

BAREFOOT, P. J.    Defendant, Joe Saffa, was charged in the superior court of Creek county, with the crime of unlawful possession of intoxicating liquor, to

wit: "90 pints and 64 half pints of assorted brands of tax paid whisky", was tried, convicted and sentenced to pay a fine of $500 and serve six months in the county jail, and has appealed.

It is first contended by defendant that the court erred in overruling the demurrer to the amended information. The grounds of this demurrer were that the information "nowhere alleges that the alleged liquor was capable of being used as a beverage", which it is claimed is an essential description of the liquor unlawfully possessed by the defendant.

The section of the statute under which defendant was charged was Oklahoma Statutes Annotated (O. S. 1941), Title 37, section 1, which is as follows:

"It shall be unlawful for any person, individual or corporation to furnish, except as in this chapter provided, any spirituous, vinous, fermented or malt liquors, or any imitation thereof or substitute therefor, or to manufacture, sell, barter, give away or otherwise furnish any liquors or compounds of any kind or description whatsoever whether medicated or not which contain more than three and two-tenths (3.2%) per cent of alcohol, measured by weight, and which is capable of being used as a beverage, except preparations compounded by any licensed pharmacist, the sale of which would not subject him to the payment of the special tax required by the laws of the United States; * * * or to have the possession of any such liquors with the intention of violating any of the provisions of this Chapter. A violation of any provisions of this section shall be a misdemeanor, and shall be punished by a fine of not less than fifty dollars ($50.00) nor more than five hundred dollars ($500.00), and by imprisonment for not less than thirty (30) days, nor more than six (6) months; Provided, however, that the provisions of this chapter shall not apply to the manufacture and sale of unfermented cider and wine made from apples, grapes, berries and other fruit grown in this

State, and to the use of wine for sacramental purposes in religious bodies."

The above statute is the act approved by the referendum election held July 11, 1933. This act amended Oklahoma Statutes 1931, section 2618, in that it changed the amount of alcohol to be contained in intoxicating liquors from one-half of one per cent to three and two-tenths (3.2%) per cent. This was the only material change made in the law by the act of 1933, as above stated.

The amended information filed in the instant case alleged, "keep and possess in excess of one quart, to wit: 90 pints and 64 half pints of assorted brands of tax paid whisky, same being a spirituous and intoxicating liquor containing more than three and two-tenths per cent of alcohol measured by weight; upon, in, or about his place of business, to wit: In the back seat of a 1939 Pontiac Coach Automobile bearing motor number 6—747345 and bearing 1940 Oklahoma license tag numbered 6—6941; said liquor being possessed with the wrongful and unlawful intention on the part of the said Joe Saffa of violating the prohibitory laws of the State of Oklahoma by bartering, selling or giving away, and otherwise furnishing the said intoxicating liquor to others."

Under numerous decisions of this court, both prior to and after the amendment of the statute, as above stated, this court has held that it was not necessary to allege in the information that the intoxicating liquor "was capable of being used as a beverage" where it is alleged that one was in possession of "whisky, same being a spirituous and intoxicating liquor", and where it is further alleged that the possession was "with the wrongful and unlawful intention * * * of violating the prohibitory laws of the State of Oklahoma by bartering, selling, or giving

away, and otherwise furnishing the said intoxicating liquors to others." Duke v. State, 48 Okla. Cr. 154, 290 P. 348; Ex parte Spencer, 7 Okla. Cr. 113, 122 P. 557; Flowers v. State, 8 Okla. Cr. 503, 129 P. 81; Haynes v. State, 45 Okla. Cr. 172, 284 P. 74; Burkes v. State, 45 Okla. Cr. 376, 283 P. 587; Key v. State, 29 Okla. Cr. 436, 234 P. 791.

We therefore hold that the court did not err in overruling the demurrer to the amended information filed in this case.

It is next contended that the court erred in failing to sustain the motion to suppress the evidence offered by the state, and in failing to sustain a demurrer to the evidence of the state.

The facts, briefly stated, are that the defendant, Joe Saffa, on the afternoon of November 25, 1940, drove his Pontiac sedan and parked the same on the public streets of the city of Drumright, and in front of the Ferguson Brothers Garage. He went into the garage, where he was approached by Walter Johnson, Commissioner of Public Safety of the State of Oklahoma, who, after informing the defendant of his official title, said, "I don't have a search warrant. Do you want me to get a search warrant to search that car?" The defendant replied, "I am not telling you what to do." There is a sharp conflict in the testimony of Mr. Johnson and the officer who was with him, and the testimony of the defendant as to the action taken by Mr. Johnson after the above conversation. Commissioner Johnson testified that he approached the car, which was standing in the public street in the city of Drumright, for the purpose of securing information as to the tag number, etc., so that he could secure a search warrant for the purpose of searching same. His testimony was as follows:

"Q. That is, out in front? A. In front of the garage, yes, sir. Q. What did you talk to him about, Mr. Johnson? A. I told him we had a number of complaints on him being in the whisky business here and that he was using that garage there to transfer loads, and asked if he had any cars in there at that time, and he said no, that he didn't have any in there, that that was his car out in front; and there was a car parked right in front of the garage. Apparently it had been getting gasoline—I don't know, but it was right by the gasoline pumps, and I told him that I wanted to look through his car and I would get a search warrant, and I went out in front to examine the car. I went around it and got the tag number on it, and as I went around the car I looked inside and the whisky was lying in the bottom of the car and the back seat. The back seat was out, and there was a blanket covering, I will say, two-thirds of the whisky—a blanket or robe. Q. Was there any cushion in the back seat of the car? A. No, there was no cushion there. Q. What did you do whenever you discovered this whisky in the back end of the car? A. Another investigator was with me at the time, by the name of Roy Mogridge. I told Roy it was not necessary to get a search warrant for it, that the whisky was in the car there, and called him over, and we then placed Joe Saffa under arrest. Q. Mr. Johnson, whenever you went around to the car the first time, were you attempting to search the car at that time? A. No, sir. Q. What was your purpose in going around the car? A. To get a description of it for the purpose of getting a search warrant. Q. To get a description of it for the purpose of getting a search warrant? A. Yes, sir. Q. What did you do with Mr. Saffa whenever you found the whisky there? A. I had him drive the car up to a little filling station, that we had information that he was a partner. It is about a mile west of town, here, I believe, on the south side of the road. When we got up there, Mr. West, another investigator out of the division, checked the whisky with me. We found about 122 pints of assorted tax paid whisky in pints and half pints. Some was in whole lugs and some was broken lugs. Q. What do you mean by

"lug"? A. A lug is commonly called six pint bottles, wrapped up together, or eight half pints, or three quarts. Q. Do you know how many full pints you found there and how many half pints you found? A. It seems to me like it was 90 full pints and 32 half pints, to the best of my knowledge. Anyway, it made around 122 pints."

He further testified:

"Q. Did you have a conversation with the defendant, Mr. Johnson, as to what he was doing with the whisky in the car? * * * A. Yes. He told me that he was peddling the whisky out of the car and using that to deliver the whisky in, and I said 'You are getting pretty bold with it, aren't you?' and he said, 'Oh, I am never bothered,' kinda like that."

He further testified:

"A. No, the theory I was going on was that I went out there to get a description of the car and the tag number, which is necessary in obtaining a search warrant, and as I walked around the car, you could look in there and the whisky was visible as I walked around the car. I was on the north side of the car. Q. You were on the north side of the car? A. Yes, sir. * * * A. And the gasoline pumps, as I recall it, was right at the rear end of the car, or pretty close to the rear end, and I walked around the gasoline pumps and checked the tag number, and then went on around the car on the north side of the car and as I walked by the glass there, I could see inside and see the whisky. Q. As you walked by what glass? A. The back glass of the car. Q. So the first view you got inside of the car was through the rear glass of the car, is that correct? A. That is right? Q. And the reason you were there was because—(interrupted) A. Not the rear but the side rear glass. Q. The side rear glass? A. Yes, sir, that is right. Q. On which side? A. On the north side. * * * Q. Where was Mr. Mogridge? A. He stayed on the side here, and this was the back end of the car. I took the tag number and walked around on this side, and as I got in this position, I looked in the car and there was the whisky in the back of the car on the floor and where the cushion should be. There

was a blanket partly covering the whisky and from that position I told Roy, I said, 'It is not necessary to get a search warrant for this car. It is full of whisky,' and I asked, 'How much have you got in here, Joe,' and he said 'About four cases,' I think. Q. Now, Mr. Johnson, was the glass rolled up or was it down? A. It was up. Q. It was up? A. Yes, sir. Q. It was clear to where you could see through the car and not only see through the car but see what was down there? A. That is right. Q. And not only see what was down there, but whether it was covered up or not, is that right? A. That is right. Q. The glass wasn't misted over, is that correct? A. No, it was clear. Q. It wasn't dirty, it was perfectly clear? A. That is right. Q. In spite of that weather? A. That is right. Q. Could you tell from where you were standing out there whether or not these were broken packages or did you find that out later? A. No, there were some broken packages in there, some loose bottles. Q. And you could see that through the window? A. That is right. Q. Could you see the blanket through the window? A. I don't recall whether it was a blanket or a robe. Q. Some kind of cover? A. Yes, sir. Q. You saw that through the window? A. Yes, sir. Q. What color was it? A. I don't remember the color. Q. What portion of the liquor was covered up with it? A. I would say about two-thirds."

The evidence of Commissioner Johnson was corroborated by Roy S. Mogridge of the Highway Patrol.

Defendant, Joe Saffa, testified in his own behalf. He admitted the ownership of the car and the whisky, but stated that the car had been registered in his brother John Saffa's name. He stated no search warrant was served on him. He testified as follows:

"Q. What then did you say? A. I said, 'Have you got a search warrant to search my car?' and he said, 'No, but I can get one if you want me to,' and I said, 'I am not telling you what to do.' Q. What did he do then? A. He deliberately walked to the front of my car, past the front, and opened the door, raised up the blanket,

and come back and got a little ways and called me and I said, 'It is raining, I am not going out there,' and then he hollered at Mr. Mogridge and said, 'Yes, it is loaded.' "

He also testified it had been raining and there was mud on the windows of the car so one could not see from the outside.

From the above testimony, it will be readily seen that under the former decisions of this court, this case comes clearly within the rule that where a public offense is committed in the presence of an officer, that it is not necessary for the officer to procure a search warrant before arresting and searching him and the property belonging to him and in his immediate presence. Oklahoma Statutes 1931, section 2780, O. S. A. (1941) Title 22, § 196. Defendant, by his own admission, had driven his automobile and parked same upon the public streets of the city of Drumright. It was a public place and an officer of the law in the discharge of his duty had the same right as the defendant upon the public streets of that city. If, as testified to by him, he observed through the window of the automobile of defendant large quantities of intoxicating liquor on the back seat and floor of the automobile, why should he be required to secure a search warrant when the violation of the law was committed in his very presence? Does the fact that he saw it through the glass window of the car cause him to be unable to act in the discharge of his duty when this violation of the law is committed in his presence? If he could not act upon the sight of this liquor, he could not arrest parties who were fighting or committing other crimes which he saw through the windows of the car. It is absurd to say that the officer did not have this right. The right to search the property or person of a citizen of this state is a sacred right and is protected by the Constitution and laws of this state, as this court has

often held, but this law also provides that when a public offense is committed in the presence of an officer he has the right to arrest the defendant, and therefore the right to search his person and property in his immediate presence. We do not mean by this statement that an officer of the law should not be careful in exercising this right. The right should not be created by an evasion or subterfuge. Neither should one who brazenly defies the law be permitted to avoid its consequences. We are only concerned with upholding the law and the Constitution as it is written. Nott v. State, 70 Okla. Cr. 432, 107 P. 2d 366; Barfield v. State, 68 Okla. Cr. 455, 99 P. 2d 544; Matthews v. State, 67 Okla. Cr. 203, 93 P. 2d 549; Arnold v. State, 70 Okla. Cr. 203, 105 P. 556; Brumley v. State, 69 Okla. Cr. 122, 100 P. 2d 465; Hutson v. State, 72 Okla. Cr. 61, 112 P. 2d 1109; Sims v. State, 73 Okla. Cr. 321, 121 P. 2d 317; Young v. State, 71 Okla. Cr. 112, 108 P. 2d 1028.

After the whisky was seen by Commissioner Johnson, defendant was immediately placed under arrest and a search of the car was made and there was found 92 pints and 64 half pints of tax paid whisky. Defendant admitted ownership of the car and possession of the whisky, stating that he had, himself, driven the car there shortly before it was discovered.

From the above statement, it is clear that the court did not err in refusing to sustain the motion to suppress and the demurrer to the evidence.

It is next urged that the judgment and sentence rendered is excessive. While the evidence reveals a large quantity of liquor, and no doubt defendant was in the whisky business, he took the witness stand in his own behalf, and there was no proof of previous conviction of any kind, we are of the opinion that the judgment and

sentence should be modified from a fine of $500 and six months in jail, to a fine of $300 and 60 days in jail. As so modified, the judgment and sentence of the superior court of Creek county is affirmed.

JONES and DOYLE, JJ., concur.